**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**TELMA HERNANDEZ,**

          **Plaintiff,**

**-vs-**                                                        **Case No. 6:05-cv-190-Orl-DAB**

**COMMISSIONER OF SOCIAL SECURITY,**

          **Defendant.**

_____

## MEMORANDUM OPINION AND ORDER

This cause came on for consideration without oral argument on review of the decision of the Commissioner to deny Plaintiff's application for Social Security benefits. For the reasons set forth herein, the decision of the Commissioner is **REVERSED** and **REMANDED** for additional consideration.

### *PROCEDURAL HISTORY*

On September 6, 2001, Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (R.54-56). The claim was denied at the initial and reconsideration level (R. 36-7; 39-40). Plaintiff requested and received a hearing before an Administrative Law Judge (herein "the ALJ"), and the ALJ issued an unfavorable decision on June 30, 2004 (R. 10-22). The Appeals Council denied Plaintiff's request for review of the administrative decision (R. 6-8), and this action timely followed.

### *NATURE OF DISABILITY CLAIM*

Plaintiff amended her date of onset and, at the time of hearing, claimed disability as of January 1, 2002, based upon fibromyalgia, with resulting pain and "unable to stand for periods of time, unable to sleep, dissy [sic], lightheaded constant headaches" (R. 85).

### *SUMMARY OF EVIDENCE BEFORE THE ALJ*

Ms. Hernandez was born on March 6, 1955 and, at the time of the hearing, was forty-nine years old (R. 54, 411). Although there is some discrepancy in the record, it appears that Plaintiff had an eleventh grade education (R. 412), with relevant work experience as an assistant manager of a retail clothing store, a sales person at a retail store, and a teacher's aide (R. 76-83, 86, 414-416).

The medical evidence relevant to the amended date of onset is set forth in the ALJ's decision. By way of background, Plaintiff underwent a splenectomy on June 16, 2000 (R. 139-40), and was diagnosed by her family physician (Dr. Perez) with fibromyalgia on December 4, 2000 (R. 250). Dr. Perez referred Ms. Hernandez to rheumatologist, Dr. Karamali Bandealy, and Plaintiff presented to Dr. Bandealy on February 1, 2001 (R 186-87). Dr. Bandealy noted that Plaintiff exhibited tenderness in the right wrist, right elbow, biceps tendon area, the shoulders bilaterally, knees and ankles, and had all 18 trigger points (R. 186). On examination on March 15, 2001, Plaintiff had equal and normal reflexes, no acute motor or sensory deficits, no stiffness or rigidity, and upper and lower extremity joint examination was unremarkable, with normal range of motion without significant pain, although trigger points continued to be sore (R. 184). Physical examination on September 17, 2001 was similar (R. 183). Plaintiff was treated conservatively, and returned to Dr. Bandealy, continuing to complain of pain, until June 2002. Diagnoses included fibromyalgia, undifferentiated collagen vascular disease, degenerative joint disease of the hands, asthma, and depression (R. 180-84).

Plaintiff was consultatively examined on November 28, 2001, by Nitin Haté, M.D. (R.151-53). Dr. Haté noted that Plaintiff's thrombocytopenia was in remission, and noted that Plaintiff looked healthy, well-nourished, pleasant, and comfortable. The only positive findings Dr. Haté found on physical examination were a midline surgical abdominal scar from the splenectomy and a restricted capacity for squatting (R. 153). Dr. Haté noted that Plaintiff "may have some difficulty in strenuous physical activities" *Id*.

On January 24, 2002, Plaintiff presented for a consultative psychological evaluation (R. 154). Plaintiff reported her mental health history as unremarkable, but described herself as a "very nervous person." (R. 155). She reported that she was capable of taking care of her personal needs, and preparing meals, washing the dishes, and doing the laundry. Her family helps with heavier chores. She reported that she enjoys reading and attending church, and she prepares food for the sick and visits the sick on a frequent basis. She occasionally goes to the mall with her relatives, and family members visit frequently. On mental status evaluation, Plaintiff was alert and oriented, appropriately dressed and groomed, and her behavior was appropriate and cooperative. Speech was logical and coherent, with a normal rate and tone. No overt symptoms of psychosis were present. Her thought processes were linear, and her attention and concentration were sustained throughout. Her mood was dysthymic, and her affect was mood congruent. Judgment, insight, and impulse control were all considered good.

Diagnosis was generalized anxiety disorder; adjustment disorder with depressed mood. *Id.*

On April 8, 2002, Plaintiff was evaluated by psychiatrist Sonny Joseph (R. 179). During this evaluation, Plaintiff complained of insomnia, racing thoughts, increased anxiety, depressed mood, crying episodes, excessive worry, increased irritability, excessive emotional sensitivity, anergia,

anhedonia and feelings of hopelessness. *Id.* On mental status examination, Dr. Joseph found Plaintiff to be cooperative, with depressed mood and appropriate affect. She was alert and oriented times three, and she denied suicidal or homicidal ideation, as well as auditory or visual hallucinations. Recall, recent and remote memory were intact, and both her insight and her judgment were within normal limits. Assessment was major depression, moderate, and medication was prescribed..

On return visit on April 22, 2002, Dr. Joseph noted Plaintiff's mood to be depressed (R. 244), but on May 6, 2002, her mood was reported as less depressed (R. 354). On May 6, 2002, less than a month after beginning treatment, Dr. Joseph completed a mental impairment questionnaire and noted Plaintiff's GAF to be 50 (R. 322), with mild improvement so far on medications. He described Plaintiff's mood as depressed and affect as "sad." He noted that Plaintiff had a variety of signs and symptoms, including difficulty thinking or concentrating, change in personality, emotional withdrawal or isolation and persistent disturbances of mood or affect (R. 323). He described a marked limitation in restriction of activities of daily living; maintaining social functioning and deficiencies of concentration, persistence or pace, and stated that Plaintiff had had three repeated episodes of decompensation within 12 month period, each of at least two weeks duration (R. 324). Based on a finding that Plaintiff "reports she has had depression and anxiety for at least several years," Dr. Joseph concluded that Plaintiff had a medically documented history of a chronic organic mental disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do any basic work activity (R. 325). Dr. Joseph opined that Plaintiff would be absent from work more than four days per month, and was unable to function outside a highly supportive living arrangement, but she could manage benefits in her own best interest. *Id.*

Dr. Joseph's notes are sparse, and difficult to read, and Plaintiff cancelled her appointments or did not show on at least five occasions between July 1, 2002 and March 5, 2003 (R. 354-53), but it appears that Plaintiff saw Dr. Joseph 18 times starting with the April 8, 2002 visit and ending with a visit on March 16, 2004 (R. 349-356; 381). It also appears that Plaintiff was treated with various medications during that time.

On July 14, 2003, Dr. Joseph completed another questionnaire, indicating that he had seen Plaintiff since April 8, 2002, "monthly, on average." (R. 318). Her current GAF was 40, and treatment response was described as "no major improvement although sleep is slightly better." Prognosis was poor, from a work standpoint, and the signs and symptoms included motor tension, psychomotor retardation, seclusiveness, and emotional withdrawal or isolation, among other things (R. 319). As a result of the mental impairment, Dr. Joseph concluded that Plaintiff had a marked limitation in her activities of daily living, marked difficulty in maintaining social functioning; and marked deficiencies of concentration, persistence or pace and would have four or more episodes of decompensation within a twelve month period, each lasting at least two weeks (R. 320).

On forms dated May 23, 2002, July 10, 2003 and updated without change on March 18, 2004, Dr. Perez evaluated Plaintiff's physical residual functional capacity (R. 326-335; 382). Dr. Perez indicated that Plaintiff's symptoms were generalized muscle pain, body aches, multiple joint pain, fatigue and headache. Dr. Perez noted that the pain could be characterized as moderate to severe. He indicated that Plaintiff was suffering from depression and anxiety, and noted that she could walk for three city blocks, sit for fifteen minutes at one time, stand 15 minutes, and lift less than ten pounds occasionally. (R. 332-334). Dr. Perez stated that the pain and other symptoms Plaintiff experienced

would frequently to constantly interfere with her attention and concentration to perform even simple work tasks, and he concluded that Plaintiff was incapable of even a "low stress" job.

In June of 2002, Plaintiff returned to Dr. Bandealy, and it was noted that her fibromyalgia was presently "quite symptomatic." (R. 180).

On November 14, 2002, Dr. Perez referred Plaintiff to another rheumatologist, Dr. Sheikh, for treatment of the fibromyalgia (R. 240). On December 4, 2002, she was seen by Dr. Sheikh, who noted that Plaintiff had discontinued follow-up with Dr. Bandealy "due to unclear reasons." (R. 236). On examination, power was noted to be normal in all muscle groups (R. 236). During the "joint examination," Dr. Sheikh noted there to be evidence of tender, palpable nodes in the joints of her hands and crepitus in the knee joint, although she had a full range of motion in all of the joints, including wrists, shoulders, ankles, knees and hips (R. 237). Dr. Sheikh indicated that "the most likely diagnosis is osteoarthritis involving small joints of hands, feet, knees, cervical and lumbar spine," as well as fibromyalgia. The doctor noted that there did not appear to be any evidence of active inflammatory arthritis or connective tissue disease, and lab tests were ordered.

During the follow up with Dr. Sheikh on January 16, 2003, upon review of the x-rays and lab results which were unremarkable, Dr. Sheikh assessed Plaintiff with mild generalized osteoarthritis involving small joints of her hands and lumbar spine, and fibromyalgia. (*Id.*). Bextra was prescribed. In letter to Dr. Perez dated March 25, 2003, Dr. Sheikh noted that Plaintiff claimed that the Bextra was ineffective, and he was referring Plaintiff to a pain clinic. (R. 234).

On April 14, 2003, Plaintiff was evaluated by Dr. Rajyaguru at the pain clinic (R.314-316). Plaintiff stated that she had pain in her neck, lower back, shoulder, leg, arm, elbow, hip, chest area, and the top of the head. (R. 314). During the physical examination, Dr. Rajyaguru noted that Plaintiff

was oriented to time, place and person and had tenderness in the paraspinal muscles, diminished range of motion in the cervical spine, guarding and tenderness in the facet joints of the cervical spine, diminished range of motion in lower back, marked tenderness in the sacroiliac joint, paraspinal muscle tenderness, and decreased sensation to pinprick bilaterally in the lower extremity (R. 315-16).  Dr. Rajyaguru concluded that Plaintiff had lumbar facet syndrome, lumbar radiculopathy, myofacial pain syndrome, lumbar nerve root irritation, cervical facet syndrome, and sacroliatis. *Id.*. Nerve root injections were prescribed, as was a home exercise program, and additional testing was ordered. (R. 317).

The motor nerve test performed on April 18, 2003, revealed lumbar radiculopathy involving the right peroneal nerve and right tibial nerve neuropathy (R. 313).

On May 2, 2003, Dr. Rajyaguru administered a nerve root injection, and advised Plaintiff to continue the medications (R. 307).  Plaintiff continued to complain of pain in the lower back and leg. (R. 303).  Additionally, the physical examination was basically unchanged, and an additional nerve root injection was administered  (R. 304).  Although the injections provided some relief (R. 300), it was recommended that Plaintiff consult a spine surgeon for further evaluation, as she felt the pain relief she was experiencing was inadequate (R. 298-99).

Plaintiff underwent an MRI performed on May 19, 2003, which revealed a small disc herniation at L4-5 and mild lower lumbar facet arthropathy (R. 271).

The record includes medical records relating to other unrelated conditions, such as an ovarian cyst, urinary tract infections and heartburn.  As Plaintiff does not rely on these records (or cite to them in her statement of facts), they are not discussed further.

The record also includes evaluations of state agency medical consultants. In October 2002, state agency medical consultant David Kitay, M.D., reviewed the evidence in the record and found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push and/or pull (R. 224). Dr. Kitay found no limitations in Plaintiff's ability to climb, balance, stoop, kneel, crouch and crawl (R. 225). On August 8, 2002, a state agency psychologist completed a psychiatric review technique form that found Plaintiff to have mild limitations from her anxiety disorder and adjustment disorder, and noted that her impairment was not severe (R. 209-222).

Plaintiff appeared and testified at her hearing regarding her pain and limitations. A vocational expert also appeared and testified.

In her decision, the ALJ determined that Plaintiff suffered from a small disc herniation at L4-5 with resulting back pain, and fibromyalgia, conditions which are severe, but did not meet or medically equal the Listings (R. 19, 22). The ALJ considered that Plaintiff's depression and anxiety resulted in mild restrictions only, and were therefor not considered to be severe impairments (R. 19-20). The ALJ discredited the opinions of Drs. Perez and Joseph, as well as the level of limitation claimed by Plaintiff. The ALJ determined that Plaintiff has the residual functional capacity to lift up to 20 pounds occasionally and ten pounds frequently; to sit/stand/walk up to six hours in an eight hour day and to perform all postural activities occasionally, and avoid dust, fumes, gas and temperature extremes (R. 22). As Plaintiff's impairments were deemed to not prevent her from performing her past relevant work as a sales person and teacher's aid, she was found to be not disabled (R. 22).

## *ISSUES AND ANALYSIS*

**The Standard of Review**

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**The Five Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not

have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Here, the decision was made at the fourth step of the process.

Plaintiff raises four issues: 1) whether the ALJ erred in determining her residual functional capacity in view of a contrary opinion from the treating physician; 2) whether the ALJ erred in determining that Plaintiff's mental impairment was not severe, in view of a contrary opinion from her treating psychiatrist; 3) whether the ALJ properly evaluated Plaintiff's pain; and 4) whether the ALJ properly evaluated Plaintiff's credibility. The issues are discussed, in turn.

**Treating Physicians**

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See*

*Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements.)

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

Here, as properly pointed out by Plaintiff, her treating physicians (Perez and Joseph) opined that Plaintiff had limitations that, if credited, prevented her from engaging in any work. At issue, then, is whether the ALJ's complete discrediting of those opinions is supported by substantial evidence, consistent with the above standards.

With respect to Dr. Perez's opinion, the ALJ stated that is was "inconsistent with the record when considered in its entirety and not supported by the evidence," noting particularly the Plaintiff's condition on physical examinations. If Dr. Perez's opinion is, indeed, unsupported by objective medical evidence, the ALJ did not err in discrediting it. *Edwards, supra.*

As pointed out by the Commissioner, Plaintiff's physical examination by Dr. Haté was generally unremarkable, with full muscle strength and range of motion in all of her joints. Moreover, Dr. Sheikh's notes show that Plaintiff had full range of motion, and her osteoarthritis was described as mild. Dr. Bandealy noted tenderness, but also noted that Plaintiff's strength was good in all four extremities. X-rays of the hands, wrists and feet were normal. Consulting physician Dr. Kitay's findings also show limitations far less than the severe restrictions found by Dr. Perez.

Moreover, Plaintiff herself reported activities that contradict Dr. Perez's limitations. Although Dr. Perez found that Plaintiff could only sit for 15 minutes at a time, Plaintiff testified that she had a driver's license and was able to drive for thirty minutes (presumably while seated) (R. 412). She also described a variety of activities to the consultative psychological examiner, such as taking care of her personal needs, preparing meals, washing the dishes, and doing the laundry. She reported that she enjoys reading and attending church, and she prepares food for the sick and visits the sick on a frequent basis. She also reported that she occasionally goes to the mall with her relatives, and family members visit frequently; all activities markedly inconsistent with the severe restrictions noted by Dr. Perez.

Although Plaintiff contends that it is improper to credit the opinion of an examining or non-examining physician over that of the treating physician, as shown here, the ALJ determined that the physical examinations performed by all of the physicians did not support Dr. Perez's opinion. Considering the entirety of the record, and applying, as we must, the deferential standard of review set forth above, the Court concludes that the determination to discredit Dr. Perez' opinion is supported by substantial evidence and was made in accordance with proper legal standards.

With respect to Dr. Joseph, the Court reaches the same conclusion. The ALJ discredited Dr. Joseph's opinions, noting that Dr. Joseph relied on the Plaintiff's subjective complaints, and his opinion was exaggerated and inconsistent with his own notes. While the Court notes that the very nature of mental illness requires at least some reliance on a Plaintiff's subjective complaints, the ALJ's conclusion that Dr. Joseph's opinion is inconsistent with his clinical findings is supported by substantial record evidence.

As shown above, Dr. Joseph found Plaintiff to be oriented and alert, cooperative, with depressed mood and appropriate affect. She denied suicidal or homicidal ideation, as well as auditory or visual hallucinations. Recall, recent and remote memory were intact, and both her insight and her judgment were within normal limits.[1] The severe limitations set forth in his opinion rendered but a month later are not correlated with any clinical findings to support same. Moreover, as noted by the ALJ, the consultative psychological examination did not support the conclusion. Indeed, it is impossible to reconcile Plaintiff's description of her daily activities to the consultative examiner with Dr. Joseph's description of her restrictions, including the findings as to Plaintiff's seclusiveness, withdrawal and inability to function outside of a highly supportive environment.[2] The record does not show any hospitalizations due to mental illness, Dr. Joseph's notes do not reflect a worsening of Plaintiff's mental status, nor is there any record evidence of any decompensation, let alone the marked

---

[1] Although Plaintiff argues in her brief that Dr. Joseph "never directly stated these conclusions," the record is to the contrary. *See* R. 179.

[2] Though not mentioned by the ALJ, the record includes a witness statement from Plaintiff's husband, dated August 28, 2002, that contradicts Dr. Joseph's conclusions, and indicates that Plaintiff visits or goes out with friends or relatives; is able to remember things, is able to concentrate, did not have any problems regarding memory, concentration, job duties or relationships with co-workers on prior jobs; does not get disoriented; is not paranoid, does get depressed but does not have any fears (R. 60-61).

-13-

decompensation Dr. Joseph noted. The ALJ's decision to discredit Dr. Joseph's opinion is supported by substantial evidence.

This, however, does not end the Court's inquiry. Although the Court finds that the ALJ was correct in not giving the severe limitations and conclusions found by Plaintiff's treating physicians controlling weight, this does not mean that the findings and treatment notes of Plaintiff's physicians can be completely disregarded. Indeed, according to the Commissioner's regulations, even when a physician's opinion is not entitled to controlling weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Here, Plaintiff had a lengthy relationship with her treating physicians, and the record reflects frequent visits, during which Plaintiff continued to complain of pain and limitations. Thus, even if the treating physicians' opinions regarding disability are disregarded, the treatment notes and objective findings contained in those notes must be considered by the ALJ in formulating Plaintiff's residual functional capacity. That is, the ALJ's conclusion regarding Plaintiff's residual functional capacity ("RFC") must still be supported by substantial evidence. Here, the Court finds that it is not.

As set forth above, the ALJ found, and the evidence shows, that Plaintiff had a disc herniation, back pain, and fibromyalgia, a disease characterized by musculoskeletal pain and fatigue. Nonetheless, in formulating her RFC, the ALJ did not appear to credit *any* limitations resulting from the foregoing conditions, despite the fact that none of the various specialists treating Plaintiff suggested that she was malingering or exaggerating her complaints of pain. Instead, the ALJ based

her RFC finding on a 2001 one-time examination by Dr. Haté (conducted well over two years prior to the determination), and the October 2002 opinion of a non-examining state agency physician (rendered over a year and a half prior to the determination). Both opinions predate the visits to and findings of the pain clinic and the MRI findings of a disc herniation, as well as the findings and treatment of Plaintiff's lumbar radiculopathy involving the right peroneal nerve and right tibial nerve neuropathy (R. 313). As such, an RFC based solely on this evidence is not supported by substantial evidence, as neither addresses the totality of Plaintiff's objectively determined conditions. Moreover, while Plaintiff's depression may well have been not severe enough to be disabling, there is insufficient (and not substantial) evidence to support the ALJ's conclusion that Plaintiff's depression had no appreciable effect on Plaintiff's ability to perform basic work activities. Even if Dr. Joseph's opinions are disregarded, the record reflects that Plaintiff was treated by the psychiatrist for approximately two years, without appreciable improvement. The 2002 opinion of a non-examining state agency psychologist and the January 2002 consultative examination considerably predate this course of treatment, and are thus not sufficiently reliable evidence as to the extent of limitations from Plaintiff's depression two years later. Additionally, the Court agrees with Plaintiff that the ALJ did not properly consider or evaluate her complaints of pain and her credibility.

**Pain**

Pain is a non-exertional impairment. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and

laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

**Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Here, the decision indicates that the ALJ did consider Plaintiff's allegations of pain, but found those limitations "not totally credible in light of the evidence of record." (R. 20, 22). Plaintiff contends that the ALJ erred in evaluating her complaints of pain in that the record reflects that her back pain and fibromyalgia could reasonably be expected to cause the pain. A mere diagnosis does not satisfy the pain standard, however, it is the limitations caused by the diagnosed condition that

must be considered. Here, the ALJ set forth a review of all of the clinical findings of record and concluded that they did not support a finding of disabling pain. The ALJ failed, however, to set forth what limitations, if any, are supported by Plaintiff's pain or provide a sufficient rationale for why Plaintiff's complaints of pain, consistently made to all of her physicians, were not credible *at all*, in view of the objectively determined conditions of back pain, fibromyalgia and disc herniation.

There is evidence in the record that Plaintiff's pain is not, in and of itself, disabling. While Plaintiff described her pain as limiting at hearing, she previously noted that she was able to cook, go shopping, clean the house, do laundry, iron, mop and dust, and is active in church (R. 72-3). Again, however, evaluating complaints of pain is not an all or nothing affair. While Plaintiff's pain may not be sufficient to be disabling itself, it may contribute to other limitations which, taken in combination, amount to disability. Here, the ALJ did not specify what effect Plaintiff's pain had on her ability to perform basic work activities, but merely concluded that the level of pain was not enough to be disabling. "The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." *Lewis v. Callahan*, 125 F.3d 1436 at 1440. The ALJ did not find that Plaintiff was pain-free, and, indeed, such a finding would not be supported by the medical evidence, nor the ALJ's own findings that Plaintiff had an impairment of back pain and fibromyalgia. As it is acknowledged that Plaintiff suffered from pain, and pain is a non-exertional impairment, it is incumbent on the ALJ to assess how that pain affects her ability to work. That assessment is not evident here, and the RFC is therefore not supported by substantial evidence.

### *CONCLUSION*

The decision of the Commissioner is not supported by substantial evidence and it is therefore **REVERSED.** The matter is **REMANDED** to the Commissioner for additional consideration regarding Plaintiff's residual functional capacity in light of her allegations of pain, depression, and functional limitations. The Clerk is directed to enter judgment accordingly and to close the case.

**DONE** and **ORDERED** in Orlando, Florida on February 23, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record